UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

JOHN J. MURPHY, SR.

     Debtor.

_____

JOHN J. MURPHY, SR.

          Appellant,

v.

RIVERTREE LANDING LLC
          Appellee.

_____/

Case No. 6:08-cv-198-GAP

## INITIAL BRIEF OF APPELLANT, JOHN J. MURPHY SR.

Raymond J. Rotella
Kosto & Rotella, P.A.
Post Office Box 113
Orlando, Florida 32802
telephone 407/425-3456
Facsimile 407/423-5498
Fla. Bar No. 157951
rrotella@kostoandrotella.com
Attorneys for Appellant

## TABLE OF CONTENTS

TITLE                                                                                    PAGE(S)

Table of Authorities ........................................................................... iii - v

Appellate Jurisdiction and Standard of Review .......................................... 1

Comment on Record ........................................................................ 1, 2

Statement of Facts and Case ............................................................... 2 - 6

Argument

      **ARGUMENT #1 - The Court was clearly and legally erroneous in finding Murphy's use of senior after his name, without any testimony by any creditor that they were mislead, or confused, and finding his understating a disclosed exempt tenant by entirety bank account by approximately $1,400 were misrepresentations, to justify a complete denial of the discharge of approximately $5,000,000 debt**................................................................................. 6 - 8

      **ARGUMENT #2 - The Lower Court's denying Murphy's discharge under §727(a)(5) finding he failed to satisfactorily explain the loss of assets was clearly erroneous and an error at law because the assets found to be not satisfactorily explained were assets not plead, and findings are contrary to unrebutted, uncontradicted, unimpeached testimony.** ............................................. 8 - 11

      **ARGUMENT #3 - The Lower Court's §727(a)(3) finding, that Murphy failed to produce "one single record created in 2004, or reflecting his financial condition on petition date because he did not maintain and produce adequate books and records from which his true financial conditions could be ascertained", was clearly erroneous as well as an error at law. The Court's determination was not based upon Murphy's personal records, but rather the records of multiple bankrupt or out of business legal entities though Murphy did produce financial records.** ........................................................................................ 11 - 15

      **ARGUMENT #4 - The cumulative errors, including the failure to require Plaintiff to plead with specificity, the expanded times for discovery, the discovery rulings on records of third parties, the findings of fact without any substantial competent support evidence, the errors at law, deciding issues not framed by the pleadings, considering and relying upon evidence not admitted into evidence, treating legal entities as part of the Murphy bankruptcy, and making findings irrelevant to a §727 action, was so prejudicial that Murphy was denied a**

fundamental right to a fair trial requiring a reversal of the Lower Court
opinion to prevent a miscarriage of justice. ............................................................ 16 - 24

    **ARGUMENT #5 - The Court committed reversible legal error by
admitting, over objection, unreliable financial statements, not given to
Plaintiff and which financial statements could only be reasonably read to be
plead toward Plaintiff's dismissed 11 U.S.C. §523 count, or alternatively,
using them for purposes other than for §727(a)(5).**.............................................. 25 - 27

Conclusion .............................................................................................. 27 - 29

Certificate of Service .............................................................................. 29

## TABLE OF AUTHORITIES

CASES                                                                              PAGE(S)

Benton v. Blair, 228 F.2d 55 (5th Cir., 1955)......................................................   23

Cacioli, In re, 463 F.3d 229, 238 (2nd Cir., 2006) ...................................................   9, 12

Caribbean K Line, Ltd., In re, 288 B.R. 908, 911 (S.D. Fla., 2002) ....................   1

Chalik, In re, 748 F.2d 616, 619 [11[th] Cir., 1984] ....................................................   8, 9

Chiasson, In re, 183 B.R. 293 (Bankr. M.D. Fla., 1995) ....................................   7

Colortex Indus. Inc., In re, 19 F.3d 1371, 1374 (11th Cir., 1994) ..........................   1

Del Monte Banana Co. V. Chacon, 466 So.2d 1166, 1175 (Fla. 3 DCA, 1985) ....   16

Dupree, In re, 336 BR 490, 494 (Bankr. M.D. Fla., 2005) ...................................   7

Gilberti, In re, 343 BR 289,295 (Bankr. M.D. Fla., 2006) ....................................   7

Goerg, In re, 930 F.2d 1563 (11th Cir., 1991) ............................................................   1

Hawley, In re, 51 F.3d 246, 248 (11th Cir., 1995) ....................................................   9

JLJ, Inc., In re, 988 F. 1112, 1116 (11th Cir., 1993)..................................................   1

Khanani, In re, 374 B.R. 878, 886-887 (Bankr. M.D. Fla., 2005) ..........................   12

MacPherson, In re, 101 B.R. 324, 326 (Bankr. M.D. Fla., 1989). ..........................   12

Mertz v. Rott, 755 F.2d 596 (8th Cir., 1992) .............................................................   7

More, In re,138 B.R. 102, 105 (Bkrtcy. M.D. Fla.,1992) ........................................   15

Piper Aircraft Corp., In re, 244 F.3d 1289, 1295 (11th Cir., 2001) ..........................   1

Post, In re, 347 BR 104 (Bankr. M.D. Fla., 2006). ..................................................   6

Republic National Bank of Miami N.A. v. Roca, 534 So.2d 736
      (Fla. 3 DCA, 1988). ........................................................................................   23

Roy, In re, 42 BR 102 (Bankr. S.D. Fla., 1984). .......................................................   7

Rudolph, In re, 2007 W.L. 559800 (11 Cir., 2007). ................................................. 8, 23

Santa Fe Downs, Inc., In re, 611 F.2d (10th Cir., 1980) ............................................ 9, 17

Silverman, In re, 151 BR 657 (Ed. NY, 1993)................................................................ 7

Stewart, In re, 263 B.R. 608 (10th Cir. BAP, 2001). ................................................... 18

Swicegood v. Ginn, 924 F.2d 230 (11th Cir., 1991). ..................................................... 6

Thomas, In re, 883 F.2d 991, 994 (11th Cir., 1989) cert. denied, 497 U.S. 1007
     (1990)............................................................................................................................ 1

Tocci, In re, 34 BR 66 (Bankr. S.D. Fla., 1983) ........................................................ 15

Tran, In re, 297 B.R. 817, 836 (Bankr. N.D. Fla., 2003) .......................................... 9, 12

United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948) ................................... 1

United States v. Viera, 240 F.2d 356 (11th Cir., 2007). ............................................. 16

## STATUTES AND RULES

11 U.S.C. §362 ................................................................................................... 24

11 U.S.C. §523 ............................................................................... ......... 20, 25-27

11 U.S.C. §523(a)(2) ......................................................................................... 2

11 U.S.C. §523(a)(2)(B) ................................................................................... 3

11 U.S.C. §541 ................................................................................................... 9

11 U.S.C. §541(a)(5) ......................................................................................... 28

11 U.S.C. §541(a)(5)(A) ................................................................................... 9

11 U.S.C. §727 ............................................................................... ......... 2, 16-17, 19,
                                                                                                       20, 26-27
11 U.S.C. §727(a)(2) ...................................................................................... 2, 26-27

11 U.S.C. §727(a)(2)(A) ........................................................... 2

11 U.S.C. §727(a)(3) ............................................................... 2-4, 11-13,
                                                                                    15-18, 21,
                                                                                    27-29

11 U.S.C. §727(a)(4) ............................................................... 2-3, 6-7, 16-
                                                                                    17, 21, 27, 29

11 U.S.C. §727(a)(5) ............................................................... 2-4, 8,10, 16-
                                                                                    18, 21, 25-29

BRCP 2004 ............................................................................... 2, 22

BRCP 3010(a) ........................................................................... 8

Fed. R. Evid. 1006 .................................................................... 16

FRBC 8013 ................................................................................ 1

5 Am.Jur.2d Appellate Review, Section 668 ........................... 16

## APPELLATE JURISDICTION AND STANDARD OF REVIEW

Jurisdiction is proper pursuant to 28 U.S.C. Section 158(a) and Federal Rules of Bankruptcy Procedure 8001. See 28 U.S.C. §158(a); Fed. R. Bankr. P. 8001.

The United States District Court functions as an appellate court in reviewing decisions of the United States Bankruptcy Court. In re Colortex Indus. Inc., 19 F.3d 1371, 1374 (11th Cir., 1994). A Bankruptcy Court's conclusions of law are reviewed de novo.[1] In re Goerg, 930 F.2d 1563 (11th Cir., 1991). Under Federal Rule of Bankruptcy Procedure (FRBC) 8013, "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the Bankruptcy Court to judge the credibility of the witnesses." See In re Thomas, 883 F.2d 991, 994 (11th Cir., 1989) cert. denied, 497 U.S. 1007 (1990). A finding of fact is clearly erroneous when the Court finds that "although there is evidence to support [the Bankruptcy Court's] finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed". United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). The burden of showing clear error falls on the party seeking to overturn a Bankruptcy Court's findings. In re Caribbean K Line, Ltd., 288 B.R. 908, 911 (S.D. Fla., 2002).

## COMMENT ON RECORD

When referring to the record, Appellant, John J. Murphy (Murphy) will use "R" for Record followed by the District Court Docket number followed by the Bankruptcy Court docket number. Rivertree's trial exhibits are referred to as "R 19 Ex. __" and Murphy's trial exhibits are referred to as

---

[1]Under de novo review, this Court independently examines the law and draws its own conclusions after applying the law to the facts of the case, without regard to decisions made by the Bankruptcy Court. In re Piper Aircraft Corp., 244 F.3d 1289, 1295 (11th Cir., 2001). ("De novo review requires the Court to make a judgment independent of the Bankruptcy Court's, without reference to that Court's analysis and conclusions.") See also In re JLJ, Inc. 988 F. 1112, 1116 (11th Cir., 1993).

1

"R 18 Ex. ___". The transcript and page, will be referred to as "T pg. ____".

## STATEMENT OF FACTS AND CASE

On February 17, 2004, Appellant and Defendant, John J. Murphy (Murphy) filed Chapter 7

bankruptcy. At his 11 U.S.C. 341 meeting of creditors, on April 2, 2004, Plaintiff/Appellee, Rivertree

Landing LLC (Rivertree) and multiple creditors extensively questioned him.

Rivertree's BRCP 2004 examination and to extend their time to object to discharge, were granted

( R 13, doc. #21 and #34). The 2004 examination was attended by multiple creditors who questioned

Murphy an entire day.

On July 2, 2004, Rivertree filed their adversary complaint objecting to Murphy's discharge under

11 U.S.C. §523(a)(2) and §727(a)(2),(3),(4), and (5).  After the Court granted a motion to dismiss,

Rivertree filed their first Amended Complaint. ( R 2, adv. #54).  There are no other amendments to the

Complaint . The Court denied ( R 3, adv. #69) a further motion to dismiss or more definite statement,

denying Murphy's request to require Rivertree specifically plead allegations relating to the §727 counts

(particularly §727(a)(2) and (4), which require elements of fraud), rather than re-alleging 39 paragraphs

with 40 subparts to be applicable to the six count complaint. The first count begins at paragraph 40 ( R 2,

adv. #54).

Count I, under §727(a)(2)(A). While it did not allege a specific asset or date an asset was

fraudulently transferred or concealed within one year of bankruptcy, it is now moot as the Court denied

relief on this count. The Court also denied relief on Count IV alleging Murphy did not provide the

Trustee with documents.

In Count II, without specific allegation, but again realleging paragraphs one through 39, sought to

2

deny Defendant's discharge under §727(a)(3), claiming unjustifiable concealment, destruction,

mutilation, falsification or failure to keep or preserve records to ascertain Murphy's financial condition.

In denying Murphy's discharge under §727(a)(3), the Court only found Murphy failed to keep records to

ascertain his financial condition.

In Count III, under §727(a)(4), Plaintiff claimed, Murphy committed false oath. The Court denied

Murphy's discharge under this count.

Count V alleged, without specifics, except to reallege paragraphs one through 39, that per

§727(a)(5), Murphy failed to explain satisfactorily his loss of assets or deficiency of assets to meet his

debts. The Court denied Murphy's discharge under this count.

Count VI sought §523(a)(2)(B) relief. Four days before trial, Plaintiff dismissed this count.

During discovery, Rivertree issued 50 subpoenas ( R 18, Ex. 9) and took eight depositions,

including a second full day deposition of John Murphy. Though Plaintiff never showed Murphy

concealed an asset, the Court, in denying his discharge, speculated there must be hidden assets. (Opinion

pg. 30-31). The experienced bankruptcy Trustee realized there were no assets for him to liquidate and

filed his statement to this effect before the trial. ( R 18, Ex. 7). The case remains a no asset bankruptcy.

Without a request or prior notice, at a pretrial conference on June 8, 2006, the Court extended

discovery to be from June 1, 2001 through September 28, 2006, 18 months after the bankruptcy filing (

R 5, adv. #162). This included discovery into the assets of Murphy's non-filing spouse, her trust and the

trusts of their children. Though the trust documents do not support it, and it is irrelevant to

§727(a)(3),(5), the Court found Murphy controlled the family member trusts, so he had an interest in

them he did not disclose.

3

Prior to trial, Murphy prepared a summary of seven boxes of personal and business entity records he originally produced at the BRCP 2004 examination. R 18, Exhibit 37 is a photo of the boxes. The motion to approve the use of the summary, was granted (adv. #319). Notwithstanding, Murphy's use of the summary at trial, and the presence of the documents during the trial, the Court found Murphy did not rely on the documents described in the boxes. (Opinion pg. 30).

During discovery, Murphy provided other personal documents, such as tax returns as they were prepared, and bank statements dated after bankruptcy. Notwithstanding, the Court found Murphy did not provide records to show his financial condition, particularly for 2004.

The three day trial began July 23, 2007 only seeking relief under §727. At trial, the Court overruled Murphy's objections to unaudited, unsworn confidential financial statements, given to others. The Court opinion continuously refers to them in denying the discharge under §727(a)(3),(5).

The objected to financial statements, were subpoenaed from banks. Murphy did not have them to produce because their last place of storage was with a former employer of Murphy, known as Very Smart Networks, Inc. (VSN). VSN ultimately collapsed, when its principal, Jack Duvall, became deceased. The unrefuted evidence by Murphy's secretary was when Duvall died, records and computer data concerning the financial statements were lost. ( R 18, Ex. 11 Judy Piersoll deposition pg.77).

During the 1990's, Murphy, on paper, was wealthy ( R 19, Ex. 166). However, when he filed bankruptcy, there is no evidence, as the Court stated, in an irrelevant findings, that the wealth was "probably financed, in part, by the creditors in this bankruptcy case" (Opinion pg. 5); nor the family "appears to have a very comfortable lifestyle in their new home" (Opinion pg. 4). The family rented and did not own a new home when the bankruptcy was filed. ( R 19, Ex. 110).

4

Murphy's successes, came from his investments in low income housing. Each were owned by a separate legal entity. Trusts were formed in 1998 and early 1999, for he, his wife, and his children (the family trusts)(T 339), with the intention to fund them from a sale of his largest holding known as Southern Apartment Specialists, Inc. (SASI). Unfortunately, SASI did not sell. In late 2000, SASI filed bankruptcy ( R 18, Ex. 31). The low income housing projects were taken back by lenders and bond holders. He was sued on his personal guarantees by KeyCorp, who represented the bond holders on multiple low income apartments. Two legal entities had to file bankruptcy. ( R 18, Ex. 32 Medina Corp.), ( R 18, Ex. 33 Cleve Development, Inc.).

In January, 2003, Murphy settled his litigation with KeyCorp. ( R 18, Ex. 22). This relieved Murphy from approximately $19,000,000 in personal guarantees. Even with this settlement, Murphys' home in Winter Park went into foreclosure.[2] His marriage was strained. After the house sale, his wife moved with their four minor children to Georgia. (Opinion pg. 4). Murphy continued to live in Orlando with relatives, trying to earn money to support the family. (Opinion footnote 14, pg. 11).

In 2003, Murphy's last interest in an ongoing business entity was Freeport Partners Inc. (Freeport) It was the general partner of Kernan Associates Ltd. (Kernan) It operated a private apartment complex in Jacksonville, Florida known as St. Johns Apartments. Kernan filed a Chapter 11 in 2003 ( R 18, Ex. 34). Freeport lost its interest when the Kernan Chapter 11 was dismissed and the property was given to the lender, Sun America, in approximately August, 2003. (T 483-484).

R 19, Ex. 166 is a financial statement dated 6/98. Though labeled a Plaintiff exhibit, it was moved into evidence by Murphy (T 333-334). The Court opinion stated it was given to Rivertree to

---

[2]During the foreclosure, the house sold in July 2003, netting $48,000, much of which was used for Murphy's family to relocate to and rent a home in Georgia.(T 418)(Plaintiff's Ex. 110)

induce them to loan Murphy money, but there is no evidence of this. (Opinion pg. 5). When Murphy

filed bankruptcy, none of the legal entities Murphy listed in Bankruptcy Schedule B-12 ( R 19, Ex. 4),

were actively doing business.  Except for MLP #1, there were no 2004 financial records for them to

produce. The MLP entity was not an income producing entity in 2003-2004.  It had an ownership

interest in West Virginia real property, heavily encumbered with liens.

When Murphy filed bankruptcy, his only source of income was as a self-employed consultant. In

Schedule I (Plaintiff Ex. 4), he estimated he would earn $6,000 per month.  His 2003 tax return showed

reported gross income of $21,105 ( R 18, Ex. 50).

After the Lower Court denied Murphy's discharge, he sought a Motion to rehear and to allow

him to reopen the evidence to supplement the record because of findings on matters not plead, and so

Murphy could answer questions the Court asked in the opinion.  This motion was denied except for the

Court to address why its use, in the original opinion, of Plaintiff's Exhibit 15, which was not admitted

into evidence, was harmless. ( R 1, Adv. doc. #336).  This appeal timely followed.


## ARGUMENT

**ARGUMENT #1 - The Court was clearly and legally erroneous in finding Murphy's use of senior after his name, without any testimony by any creditor that they were mislead, or confused, and finding his understating a disclosed exempt tenant by entirety bank account by approximately $1,400 were misrepresentations, to justify a complete denial of the discharge of approximately $5,000,000 debt.**

To justify a §727(a)(4) denial of discharge because the Debtor made a false oath, the false oath

must be fraudulent and relate to a material matter. <u>Swicegood v. Ginn</u>, 924 F.2d 230 (11th Cir., 1991).

The issue is one of intent to determine if the omissions were merely mistakes or the result of deliberate

and purposeful intent. <u>In re Post</u>, 347 BR 104 (Bankr. M.D. Fla., 2006).  For a false oath to be material, it

must bear relationship to Debtor's business transactions or estate, or concern discovery of assets, business dealings or existence and disposition of property. Mertz v. Rott, 755 F.2d 596 (8ᵗʰ Cir., 1992); In re Gilberti, 343 BR 289,295 (Bankr. M.D. Fla., 2006). A false oath or account should not apply to minor errors; if the false statement or omission has no impact on a bankruptcy case, it is not grounds to deny a discharge. In re Dupree, 336 BR 490, 494 (Bankr. M.D. Fla., 2005); In re Chiasson, 183 B.R. 293 (Bankr. M.D. Fla., 1995); a trivial sum, when considering the Debtor's circumstances, will not support a finding that Debtor knowingly and fraudulently made a false oath. In re Roy, 42 BR 102 (Bankr. S.D. Fla., 1984).

Where an asset is scheduled, but under valued, courts usually require the understatement to be so outrageously low that any reasonable person would immediately recognize the valuation as baseless or with reckless disregard of the true value. In re Gilberti, 342 BR at 295.

The following two matters did not support what is needed to prove false oaths:

A)      Murphy using the suffix "Sr" instead of "Jr" (Opinion pg.11, 34). He started to use Sr. out of respect for his deceased dad. He stopped this after he viewed Plaintiff harassing him about the use (T 26).

This was not plead to be a false oath. It appears in paragraph 32 of the Amended Complaint. Paragraph 32 does not allege Murphy's use of Senior, was done knowingly and fraudulently or as a false oath. The Complaint does not allege the required elements of 727(a)(4) as to the Senior suffix.

Even if properly plead, the use of a suffix alone, does not meet the materiality requirement or that it bore a relationship to the Debtor's business transactions, estate or could discover assets. In Re Silverman, 151 BR 657 (Ed. NY, 1993), is a case not involving a suffix, but an alias. In this decision, the Court found the failure to list an alias was not material.

A clearly erroneous finding occurred when the Court speculated, on pages 11 and 36 that Murphy used Senior "likely hoping to distance himself from the bankruptcy after the case is closed" and "to confuse the creditors while the case is pending". (Murphy testified to the contrary, T 26, 342-343, 409). No creditor testified in this case, so there is no proof they were confused because Murphy used

7

Senior. Nor does the record show a creditor was confused. The 341 meeting was attended by five attorneys (including Rivertree's counsel) representing creditors. Four of the creditors filed adversary proceedings. All scheduled creditors were sent notices by the Bankruptcy Court of the filing. Murphy filed in Orlando, Florida, using his correct social security number. Creditors knew he lived in Orlando. It was impossible for Murphy to hide his bankruptcy from his creditors.

      B)      The Court found a false oath because the tenants by the entireties Bank of America account, ending 8405, was scheduled for $500 when bank statements, received after bankruptcy, showed $1,885.94. The Court made no finding of intent or materiality, only stating that "Murphy misrepresented the amount of cash in the account" (Opinion pg. 13).

      Murphy's wife also deposited money into this account from her trust ( R 18, Ex. 51)(T 376-379), and she wrote checks on the account (T 45), making it easy for a mistake to occur.

      Unlike bankruptcy cases deciding omission of assets, the account was scheduled and not hidden. It was claimed exempt as a tenants by entirety account so the amount would be fully protected. The Court did not explain why it refused to accept this unrebutted testimony of mistake, or find the undervalue to be immaterial, given the exemption and size of the debt.

      Even without the exemption, this was trivial.  A Trustee would not administer a $1,886 estate for $5,000,000 debt. A dividend would be too small to send creditors. See BRCP 3010(a).

      **ARGUMENT #2 - The Lower Court's denying Murphy's discharge under §727(a)(5) finding he failed to satisfactorily explain the loss of assets was clearly erroneous and an error at law because the assets found to be not satisfactorily explained were assets not plead, and findings are contrary to unrebutted, uncontradicted, unimpeached testimony.**

      11 U.S.C. §727(a)(5) states that a Debtor's discharge will be denied if "the Debtor has failed to explain satisfactorily, before determination of a denial of a discharge, under this paragraph, any loss of assets or deficiency of assets to meet the Debtor's liabilities."

      Whether a Debtor satisfactorily explained a loss of assets, is a question of fact, making the clearly erroneous standard applicable (see In re Chalik, 748 F.2d 616, 619 [11th Cir., 1984]). Unlike here, the

creditor clearly pleads, so the Debtor knows what assets he is to explain and the decisions usually find the Debtor provided <u>no</u> documents. <u>Chalik</u>, 748 F.2d pg. 620; <u>In re Hawley</u>, 51 F.3d 246, 248 (11th Cir., 1995); <u>In re Tran</u>, 297 B.R. 817, 836 (Bankr. N.D. Fla., 2003); <u>In re Cacioli</u>, 463 F.3d 229, 238 (2nd Cir., 2006). The <u>Cacioli</u> Court held "as long as Debtor's explanation is convincing and not rebutted, there is no need for documentary consideration".

Importantly, the assets the Court states Murphy did not explain were not plead by Plaintiff. Without being asked, to Murphy's prejudice, the Court improperly went beyond the pleadings. In re <u>Santa Fe Downs, Inc.</u>, 611 F.2d (10th Cir., 1980). Then, the Court denied Murphy's reasonable request to reopen the evidence and to supplement the record, to allow him to put in additional evidence on the unplead matters, used by the Court to deny his discharge.

Murphy justifiably went to trial on only what was plead. The Complaint paragraphs 34(a)(b) and 35(a)-(f) are all that could reasonably be read to relate to a failure to explain a loss of assets. The Court opinion did not address these plead assets. The evidence was irrefutable that Murphy did not personally own an interest in any of the entities or the bank account alleged in paragraph 35(a)-(f). Also, paragraph 34(a) and (b) entities (Freeport and MLP #1) were proven to have no real worth (T 443-447).

At trial, Murphy could not predict the Court, without a proper pleading, would focus on a closed bank account with Century Bank (pg. 19, 37 of opinion), or pre-petition Bank of America deposits (pg. 14, 36 of opinion); a second Bank of America bank account #3071 opened post petition (pg. 15, 27, 37 of opinion)[3]; and a long ago liquidated IRA account (pg. 37 of opinion).

The objected to financial statements were the source for many of the Court errors. The Court, without Plaintiff proving the assets existed on the day of bankruptcy, constantly used the pre-bankruptcy financial statements rather than looking at the documents Murphy produced. The records Murphy

---

[3] As a matter of law, it was error to consider a post-bankruptcy acquisition of assets because they are not property of the estate under 11 U.S.C. §541. The only exception is §541(a)(5)(A) which looks past bankruptcy for 180 days for assets from a bequest or will; a life insurance policy or a property settlement.

provided during this case (many showed he did not own assets in the erroneous financial statements)[4], did satisfy what was needed by §727(a)(5) to show the loss of assets. These included:

A)      The CC Residential account receivable for $656,000 was lost due to the foreclosure which was in existence when the bankruptcy was filed and ended with the Final Judgment dated March 25, 2004 ( R 18, Ex. 27). While the unreliable financial statement (Plaintiff's Ex. 172) showed an ownership interest in CC Residential, it was erroneous (T 95, 422-423). Murphy did not own an interest in CC Residential, as shown by R 18, Exhibit 26.

B)      R 19, Exhibit 172 entry for Freeport Partners became valueless when Sun America took back the St. John's apartments after Kernan's Chapter 11 was dismissed.  Freeport was removed as the general partner. Freeport dissolved September 2003 ( R 18, Ex. 34). The Freeport loan of $356,000 as well as the $1,000,000 developer fee, became uncollectable.(T 483-484).

C)      Very Smart Networks (VSN) was mistakenly listed on the financial statement as a $449,000 loan receivable (T 483). Regardless, it went out of business, making the $449,000 loan account receivable shown in Plaintiff's Exhibit 172 uncollectable.

D)      Murphy's 40% interest in MLP #1 Ltd., eroded by February 17, 2004 to where it was not worth $186,000 as reflected in Plaintiff's Exhibit 172. The real property was lost and MLP #1 went out of business ( R 18, Exs. 21, 22) (T 445-447).

E)      The life insurance trust valued at $3,600,000 in R 19, Ex. 170, no longer had a term policy and was without value. The trust did not appear on the later two financial statements - R 19, Exs. 171, 172, because it had been lost and therefore was without value.

F)      When Medina filed bankruptcy (Defendant's Exhibit 32), the $457,000 on the financial statements was lost (T 444).

G)      The financial statements entry for the Primary Mortgage Company, as a second mortgage on Colonnade Apartments, became uncollectable when these apartments were lost  (T 445).

---

[4]Though the Court opinion found the financial statements to be unreliable (Opinion pgs. 5, 8, 9, 10), in contradiction to this, the opinion constantly uses the objected to financial statements to deny Murphy's discharge.

H)      The ten percent Xethanol $855,000 entry in R 19, Exhibit 172 was a mistaken entry. Murphy did not own stock in Xethanol. A deal was being negotiated for Murphy to be given an interest in Xethanol, but it never happened. ( R 6, 17, 18, Ex. 52) Taylor depo. pgs. 21-22.  Also, all witnesses, without rebuttal, including the principals in Xethanol, Taylor and Skyranz, testified John Murphy was never a shareholder in Xethanol. This was corroborated, unimpeached testimony the Court had to accept unless it gave an explanation why the Court would not be bound by it. Xethanol stock is also discussed at page 23, paragraph 14, in this brief.

I)      The $735,000 equity in the home, in Rivertree's Exhibit 172, sold, during the foreclosure proceeding, and only netted $48,000 (T 418-419). ( R 18, Ex. 30).

J)      The entry in the financial statements as "other (jewelry/art)". In all financial statements, beginning in 1998, it was always valued at $274,000. Why this was no longer available on the day of bankruptcy, is discussed infra on page 22, paragraph 13.

K)      $109,000 in cash in bank accounts reduced down to $1,885 in the Bank of America tenant by entirety account on the day of bankruptcy.

L)      The pension profit sharing plan money was cashed during 2000 as shown by the 2000 tax return ( R 18, Ex. 48, line 15a).

M)      Murphy's negative $24,000,000 in an unsigned, unsworn February 2002 financial statement, was because of the SASI collapse and his personal guarantees to Key Bank. When Murphy settled with Key Bank ( R 18, Ex. 24), his personal guarantee liabilities to Key Bank, which he estimated to be $19,000,000 disappeared.  This included the Harris Road $3,500,000 debt; Monterrey Associates $4,600,000 debt; Branchtree $5,400,000 debt; Key Bank $4,500,000 debt; Key Bank Pointe $739,000 debt.

All of the above shows it was clearly erroneous to deny Murphy's discharge when the above documents and testimony satisfactorily explained why Murphy lost his assets.


**ARGUMENT #3 - The Lower Court's §727(a)(3) finding, that Murphy failed to produce**

11

"one single record created in 2004, or reflecting his financial condition on petition date because he did not maintain and produce adequate books and records from which his true financial conditions could be ascertained", was clearly erroneous as well as an error at law. The Court's determination was not based upon Murphy's personal records, but rather the records of multiple bankrupt or out of business legal entities though Murphy did produce financial records.

§727(a)(3) denies a discharge if Debtor concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information from which Debtor's financial condition or business transactions might be ascertained, unless justified by the circumstances of the case. The Court only found there was a lack of records.

Typically, unlike Murphy, the Debtors denied a discharge under §727(a)(3) produced no documents, making it impossible to ascertain Debtor's financial condition or business transactions. In re Cacioli, 463 F.3d 229, 235 (2nd Cir., 2006); In re Tran, 297 B.R. 817, 836 (Bankr. N.D. Fla., 2003); In re Khanani, 374 B.R. 878, 886-887 (Bankr. M.D. Fla., 2005); In re MacPherson, 101 B.R. 324, 326 (Bankr. M.D. Fla., 1989).[5] In Cacioli, the Court also stated proof can be presented orally.

The Court was so mesmerized by the objected to financial statements, that it ignored the evidence that showed Murphy produced records of his financial condition, and denied Murphy's discharge because he could not produce the financial statements. (Opinion pg. 28).

There are no cases that hold, the only way a Debtor can prove financial condition is to produce past prepared financial statements. Also, the opinion did not discuss why it ignored the unrebutted testimony that the financial statements were not produced because they were not in Murphy's possession or control.[6] §727(a)(3) requires the Court to address if there is justifiable reason for a document not

---

[5]Many Courts in looking at §727(a)(3), including the Lower Court, use words like "adequate" or "sufficient" records, while §727(a)(3) uses the words "...any recorded information". As the Court did not use the correct standard of "any recorded information", a de novo review warrants a reversal, since Murphy produced many documents.

[6] During trial, Murphy and his former secretary, in unrebutted, unimpeached testimony, testified the financial statements became lost when VSN went out of business after Murphy left their employ and their sole officer and majority shareholder became deceased.

Q.    Who would you [Judy Piersoll] believe to have the most knowledge about the whereabouts of those financial statements?
A     That would be Jack Duvall.
Q.    And who is - -
A.    Unfortunately, he is deceased.

being available.

In denying his discharge under §727(a)(3), the Court erroneously looked at Murphy's lifestyle three to five years before the bankruptcy, and not his life as it was when he filed the bankruptcy. On February 17, 2004, he no longer had a life complicated with business entities, but rather creditors chasing him (see R 19, Ex.5, question 4, statement of affairs, showing the number of lawsuits). He was nomadic in his lifestyle (or as the Court says in footnote 14, page 11, "peripatetic"). As the Court noted: Murphy stayed with others in Orlando after his family moved to Georgia, including a room in his mother-in-law's house to "try to salvage as much of the financial ruin as possible".[7] As with any wage earner, his financial condition and affairs on the day of bankruptcy, could be determined by looking at Murphy's produced bank statements, deposits, tax returns[8] ( R 18, Exs. 42-50).

It is this person the Court should have judged on needed records he had to produce when he filed bankruptcy in early 2004, rather than the person that had an interest in active and ongoing business entities as was the situation years before the bankruptcy. In the last five months of 2003, Murphy was not in any business ventures, but rather he was either self-employed or employed, receiving W-2 income (Murphy's 2003 tax return, R 18, Ex. 50). The legal entities with which he had an equity interest financially collapsed, filed bankruptcy, or had gone out of business. After the 2003 loss of the St. John apartment complex, Freeport Partners was removed as the general partner. Murphy no longer was an equity owner of an operating legal business entity.

In reading the opinion, one would conclude Murphy produced no records. R 18, Exhibit 37 is a

---

Q.    Why do you think that Mr. Duvall would have the - - would have had the most knowledge about that?
A.    Because he was put in charge of moving the files as we would go from office to office. I think there were some files in storage at one time.
( R 6, 17, Piersoll depo, Pg. 74, lines 2-19)

[7]The quoted words are those of the Lower Court in footnote 14, page 11 of the opinion. Murphy is perplexed why after the findings in footnote 14, the Court speculated Murphy had valuable not disclosed assets.

[8]These documents show financial records in 2004, both before and after the February 17, 2004 bankruptcy filing date, and contradict the Court's finding Murphy did not produce "one single record" created in 2004 to reflect his financial condition.

picture of the produced seven boxes of records. Murphy continued to add new records of bank accounts and tax returns as they became available. ( R 18, Ex. 42-50). These definitely satisfied §727(a)(3) for an individual debtor like Murphy.

In the Plaintiff's Complaint at paragraph 37(a)-(n), Plaintiff plead specific records it claimed Murphy "failed to provide" from Freeport Partners, Cleve Development, Kernan Associates Ltd., Southern Apartment Specialists Inc. (SASI), SASI Development, Medina Mortgage, Primary Mortgage, Very Smart Networks, and MLP Ltd. Murphy testified from the Defendant's Exhibit 39 summary of the exhibits in the boxes, to show how, notwithstanding the allegation, the boxes did contain the financial documents of the entities. (T 320-331). The Court did not find, as to these alleged entities, that records were not produced.

The opinion, on page 30 when addressing the seven boxes, as a matter of law, erroneously states "Murphy himself did not rely on these documents (in the boxes) at trial to support his position that a discharge should issue". During the entire trial, the boxes were in Court for inspection and use. Murphy's summary ( R 18, Ex. 39) and testimony shows the financial records contained within the boxes were used, showed documents produced, and did shed light on why the legal entities had no value. Fed. R. Evid. 1006 makes the summary a substitute for the boxes of records.

Though the Court stated the seven boxes of records were "largely irrelevant filler" (pg. 30), they were not. The boxes contain not only bank statements, but also ledgers, tax returns, the Murphy homestead closing statements, account statements, check registers, by-laws, leases, title policies for real estate purchases, consulting agreements, loan history statements for legal entities, default letters from lenders of the entities, final judgments, settlement agreements, promissory notes, loan documents, appraisals for the business entities known as Freeport Partners, Kernan Associates, St. John's Estates, MLP #1 Ltd., Cleve Development (f/k/a J. Murphy Management, Inc.), Medina Corp. SASI of Ohio, Primary Mortgage, as well as Murphy's banking statements for accounts with Huntington Bank, Sun Trust, Bank of America, Century Bank. These are business entity records to show the entities and Murphy's financial affairs.

14

In straying from the pleadings, the Court stated on the bottom of page 29, "Murphy did not produce general ledgers, balance sheets, or the normal type of financial reports that would allow creditors to ascertain a company's value". An individual does not usually generate these kinds of records. These are kept by legal entities. As a matter of law, an individual Debtor need not produce a legal entity's records. They are records of business entities. Business entities are not the individual Debtor. In Re Tocci, 34 BR 66 (Bankr. S.D. Fla., 1983). The Tocci Court held a corporation is a bona fide separate entity and if it fails to keep adequate records of corporation, this cannot be used to deny an individual Debtor's discharge. In Re More,138 B.R. 102, 105 (Bkrtcy. M.D. Fla.,1992), also held as did the Tocci Court.

There has never been a pleading or finding that Murphy was an alter-ego of any of the business entities for which he was either a general partner, a limited partner or shareholder. This being so, the legal entities alleged in paragraph 37(b) are not "the individual debtor". §727(a)(3), in discussing records, uses "Debtor" in its definition of records. The statute does not say the Debtor and any legal entity he is involved in, must produce records. This is important because it is obvious the Court's reason to deny Murphy his discharge was because the Court believed the legal entities did not produce their ledgers, balance sheets and financial records in early 2004 (Opinion pg. 29).

Therefore, when the Court finds on page 27 "Murphy's production is woefully inadequate" and on page 28, that Murphy failed "to maintain or produce minimal financial records to Rivertree, explaining his current financial condition", or "Murphy gave Rivertree boxes of largely irrelevant and useless records in an attempt to avoid meaningful production", or as was stated on page 29, "Murphy produced no financial record created in 2004 or reflecting his financial condition on petition date", the Court legally erred, because he did give bank statements and tax returns and the statute does not require an individual Debtor to produce the records of legal entities described by the Court. Also, any finding Murphy failed to produce "a single record" in 2004, was clearly erroneous because Murphy did produce his individual tax records and bank statements for January through February 17, 2004, and well past those dates to comply with discovery orders.

15

**ARGUMENT #4 - The cumulative errors, including the failure to require Plaintiff to plead with specificity, the expanded times for discovery, the discovery rulings on records of third parties, the findings of fact without any substantial competent support evidence, the errors at law, deciding issues not framed by the pleadings, considering and relying upon evidence not admitted into evidence, treating legal entities as part of the Murphy bankruptcy, and making findings irrelevant to a §727 action, was so prejudicial that Murphy was denied a fundamental right to a fair trial requiring a reversal of the Lower Court opinion to prevent a miscarriage of justice.**

This argument and the argument in Argument #5 are made in the event the Court does not agree each of the first three arguments should result in a reversal of the denial of discharge.

Federal Courts recognize the cumulative error doctrine. The cumulative effect of the multiple errors, even if individually harmless, in the aggregate, affected Murphy's right to a fair ruling by the Court. See 5 Am.Jur.2d Appellate Review, Section 668.  See also U.S. v. Viera, 240 F.2d 356 (11th Cir., 2007). The Florida case of Del Monte Banana Co. V. Chacon, 466 So.2d 1166, 1175 (Fla. 3 DCA, 1985) discusses the two categories of cumulative error being a "shotgun cumulative error' and a "machine gun cumulative error".

The Court read and relied upon documents not in evidence, decided issues not presented by Plaintiff's Complaint, used speculation, made fact findings that did not prove the §727(a)(3)(4) and (5) Complaint, and made findings on the dismissed §523 counts. The Court developed its own theory why Plaintiff should win, rather than following the law and what was relevant to what was plead.

### REVIEW OF DOCUMENTS NOT IN EVIDENCE

A major error occurred when the Court extensively reviewed and relied upon, in its original opinion, the lengthy R 19, Exhibit 15, which was not admitted into evidence.  It is a document referred to in the original opinion at pages 19, 28, 29 and 36.  Exhibit 15 is a document consisting of a four page self serving affidavit, a summary not approved for use under Fed. R. Evid. 1006 consisting of 34 pages, and 26 pages of emails and letters. It is replete with wrong information about what was in the Defendant's seven boxes. The Court tried to correct this after Murphy disclosed the error in the Motion to rehear, by downplaying the error. The taint could not be expunged because the Court was influenced by it, to the prejudice of Murphy.

16

## FINDINGS ON MATTERS NOT PLEAD

Another major error was the findings of fact and conclusions of law, on matters not plead, by Rivertree. In re Santa Fe Downs, Inc., 611 F.2d 815 (10th Cir., 1980). These include:

1)      Murphy provided false information to creditors (page two of the opinion). There is no proof of this, as no creditor testified. Nor does §727 grant relief for this, even if the finding had record support.

2)      Murphy created a new financial picture for each creditor to assuage them (page eight of the opinion). There is no proof of this as no creditor testified. Again, even if true, it would not be the basis for §727 relief.

3)      Murphy could not explain the source of the deposits made in the tenant by entirety account (page 14 of the opinion). This too is irrelevant to a §727 action. There is nothing in a §727(a)(3)(4) or (5) action that would have required Murphy to do an audit of the account. Murphy went through the bank records, prepared a summary over night ( R 18, Ex. 51), and testified at trial about the sources of the deposits. (T 302-320, 448).

R 18, Exhibit 51 showed total deposits of $206,000 from June 9, 2003 through April 28, 2004 showing why Rivertree's counsel's representations were incorrect.[9] The page four summary, shows $46,041 related to Murphy's income, or $5,115 average per month; Juli's deposits were $76,380 and deposits of others who he explained in Court totaled $73,606.[10] Therefore, Murphy showed there was not an additional $20,000 as the Court states on page 13.[11]

The only conceivable relevance of the Murphy deposits would be if the Court found (which it did not) Murphy misstated his income on Schedule I to be the "estimated" $6,000 per month current

---

[9]Plaintiff's counsel had represented the deposits totaled $61,000 more.

[10]Including the checks deposited from the Georgia landlords, Reyes and Cook, who Plaintiff also subpoenaed ( R 18, Exhibit 9).

[11]On page 14, the Court states there was not documentary proof to support deposits into the account. Some of the deposits from the landlords and also London Manhattan are on the statement by name and this would be the documentary evidence; the emails and deposits from the house closing would be documents.

income. However, a prior year's deposits cannot be used to show estimated current income for bankruptcy Schedule I would be a false statement. In re Stewart, 263 B.R. 608 (10th Cir. BAP, 2001).

Rivertree was liberally and erroneously given 18 months, post-bankruptcy, to follow Murphy's life, yet Rivertree showed no evidence to show Murphy's estimate of future income was not a good estimate.

4)      Murphy opened an undisclosed Bank of America bank account #3071(Opinion pg. 15).[12] This too is irrelevant to §727(a)(3),(5) counts. Also, the only evidence in this record is the account was opened after bankruptcy (T 457), making it further irrelevant.

5)      That Murphy had other personal property, including jewelry and artwork (Opinion pg. 16).  Rivertree never plead these were unexplained assets. Murphy did explain same (T 478-480). However, because of the Court already being tainted for multiple erroneous reasons, Murphy's testimony was given no credibility. (This topic is discussed further in this brief at page 21, paragraph 13).

6)      A Century Bank account.[13]  (The account balance of Century Bank on June 9, 2003 was $11,000)  (Opinion pgs. 19 and 36). Rivertree never plead anything about this account.

7)      Murphy family trusts were a Murphy asset not disclosed (Opinion pgs. 20, 21).[14] This was also pure speculation. The trust documents show no support for the finding. ( R 19, Ex.155-160).

8)      The finding there was no credible evidence to show who owned the Xethanol stock, but it is "likely" Murphy held an interest in Xethanol stock (Opinion pgs. 22, 23, 24, 26).[15]

### EXAMPLES OF NO EVIDENCE AND COURT MISTAKES

Adding to the cumulative error, the opinion made clearly erroneous findings because there is no evidence support and/or are clear mistakes. These include:

---

[12]This is discussed in more detail pg 20, paragraph 9 of this brief.

[13]The account had been closed more than six months before bankruptcy.

[14]This is discussed in more detail on page 24, paragraph 16 of this brief.

[15]This is also discussed in more detail on page 23, paragraph 14.

18

1)      The April 2003 financial statement was given to a creditor known as Dolce, when it was not (Opinion pg. seven). The Dolce financial statement was marked for identification as Rivertree's Exhibit 169, but not admitted in evidence. It was Exhibit "F" to Rivertree's Amended Complaint. Murphy assumes Rivertree decided not to use it because they knew it was replete with errors, the biggest of which was the assets scheduled were Mrs. Murphy's assets.

2)      In the May 9, 2003 financial statement Murphy "swore" his net worth was $5,732,460. (Opinion pg. 7). Similarly, page nine, the Court states all of the financial statements (Exhibit 170-172) were sworn to by Murphy.[16]  None of these were sworn financial statements.

3)      Page 38 Murphy did not keep minimal records and he made oral, often conflicting explanations and testimony.[17]

4)      Though Plaintiff's eight depositions and 50 subpoenas failed to find a single asset for the Trustee to administer, the Court speculates on page 30, that this lack of success is because Murphy did not keep records to lead them to an asset. Further speculation is at page 31, where the Court states it "is convinced Murphy retained assets but chooses not to share the information with others". The Court did not describe the retained assets in its opinion. These comments are pure speculation and as such are clearly erroneous.

5)      The statement on page five of the opinion that the only reason Rivertree's predecessor extended a loan, was because of the R 19, Exhibit 166 false financial statement Murphy gave to Plaintiff's predecessor. There is no testimony or written evidence to support this. As earlier stated, Murphy, not Plaintiff, moved the document into evidence. It is also an irrelevant finding to a §727 action.

_____

[16]In the Order on the Motion to rehear, the Court at page four and six again erroneously finds they were sworn financial statements, reinforcing why the Judge  concluded Murphy testimony was "often conflicting" (Opinion page 38).

[17]The documents in evidence refute the minimal record statement.  Though deposed two full days and an hour at a 341 meeting and he spent three days on the witness stand, Murphy's testimony was incredibly free from major conflict items. Rarely, if ever, can a witness be perfect.

6)      Similarly, on page five of the opinion, that Plaintiff settled a pre-bankruptcy lawsuit with Murphy only because of a negative $24,345,400 financial statement. This is irrelevant to a §727 action. It would be a required finding under §523 count except Plaintiff dropped the count before trial. Rivertree presented no witness to say why they settled. Murphy had evidence to the contrary, but did not present it because §523 was no longer a count to be tried.

7)      Similarly, on page five, that Murphy quickly defaulted on the settlement agreement after making only one payment of $15,000. While Murphy concedes he made a $15,000 payment toward a pre-bankruptcy settlement, Plaintiff presented no evidence toward this as it was a §523 issue and irrelevant to the §727 counts.

8)      The Court on page 36 queries what became of the $54,720 profit sharing. Again, Murphy did not know the Court would focus on this, as it was not plead. The profit sharing, while admittedly in the 2003 financial statements, was a mistake, because in 2000, Murphy cashed the $65,000 profit sharing ( R 18, Ex. 48, line 15a).

9)      On pages 15 and 16, the Court concludes on the day of bankruptcy, that Murphy maintained a second bank account at Bank of America ending with 3071, which was not disclosed in the schedules. There was no proof the account existed on the day of bankruptcy. Nor did Rivertree's Complaint plead what the Court stated. The R 19, Exhibit 153, admitted over Murphy's objection, shows the bank statement was dated post-bankruptcy.

Without Rivertree proving account 3071 was a pre-petition account, the Court improperly switched the burden to Murphy. If Rivertree, because of its subpoena on Bank of America ( R 18, Ex. 9) had proof the account ending in 3071 was opened pre-petition, Plaintiff should have (and from the vast documents it submitted into evidence, would have) presented this proof.

10)      Opinion page 19 that the interest  J. Murphy Management, Inc. was not scheduled. The Court finding contradicts its page 17, footnote 22, stating it was the former name of Cleve Development, Inc., an entity in Schedule B ( R 19, Ex. 4) ( R 18, Ex. 33).

11)      On page 13, the Court speculates that Murphy created the Bank of America joint

20

account number 8405 within five days of bankruptcy, "perhaps thinking the money in the account would be better protected from his creditors...", was not plead in the Complaint. It is also not relevant to §727(a)(3),(4) or (5).

There was no evidence to support the speculation. It was understood it was a joint account, until Bank of America began to give Mr. Raley, as Trustee of the Julianne Murphy Trust, trouble making deposits. (T 376-379). New paperwork had to be signed to create the account. Raley's email is in the Julianne Murphy deposition, Exhibit 12B and is dated January 15, 2004.[18]

This Raley email is why Juli's name was added, to effectuate the joint account they understood already existed. Again, it is uncontradicted evidence that cannot be ignored.

12)    The Court questioned what became of the $33,950 from the sale of Murphy's house. R 19, Exhibit 110 showed the $33,950 was sent to TREP on July 1, 2003 to rent a house.

While this was enough, Murphy asked the Court to allow him to reopen the evidence (Adv. Doc. #328) to introduce what is attached to the rehearing as the Exhibit "B" check from the closing attorneys, Infantino and Berman. The law firm was subpoenaed ( R 18, Ex. 9). The Motion to rehear on Exhibit "B" is the Infantino check for $9,650.52.[19] The deposit ticket also shows the Bank of America joint account 8405 dated July 2, 2003.[20] There was no reason to hide these checks. Murphy did not know the Court would look into the closing statement proceeds, when Rivertree did not plead or put in evidence the use of the proceeds were not disclosed.

---

[18]In Exhibit 12A, is Patrick Raley's email of January 15, 2004 in which he states in paragraph four of the email:

> "This will confirm receipt of Julie's instruction about transferring $3,000 to the checking account. As I mentioned last time, Bank of America tells me your checking account is set up solely in John's name. This requires me to make the transfer checks from the trust's checking account payable to him. Please straighten this out with Bank of America."

[19]The $33,950 and the $9,650.52 are not on the closing statement, but did come from the sale proceeds of the house.

[20]This is why the Murphys had this understanding in 2003, that the account was a tenant by entirety account in Mr. and Mrs. Murphy's name.

13)     The "other (artwork/jewelry)". In all of the financial statements, they reflect them to be

$274,000. Rivertree knew about this entry in the financial statement, as early as the BRCP 2004

examination where Murphy was questioned about the jewelry and house contents[21]. Notwithstanding, it

was not raised in Rivertree's Complaint as an unexplained asset.

Also, attached to the Motion to reconsider and requesting the evidence be reopened ( R 11, adv.

#328) was Exhibit "D".  It evidenced the sale of Murphy's Rolex watch on May 22, 2003[22] for $8,750,

which is an additional document the Court was asked to reopen the evidence to admit it into evidence

after the Court's unexpected findings.

A similar request to reopen the evidence was made in the Motion to rehear and reopen the

evidence ( R 11, adv. #328) which attached Exhibit "E", the contract on the sale of the house (Infantino

---

[21]Q.     Other, and by other, I'm referring specifically, and I don't see a schedule of it (the financial
           statement), but on the front page it says other, jewelry, slash, art $274,000.  Tell me about that.
A.        That would have been everything at the Interlachen house that was in the house and would have
          included my Rolex watch, some of my golf memorabilia, curtains, chandeliers, wall sconces.
Q.        Well, are wall sconces and chandeliers and curtains considered art?
A.        No.  They're considered other, and some of the wall sconces were art pieces because they were
          antiques.
Q.        And those went with the house?
A.        Yes, they did.
Q.        Tell me about the jewelry.
A.        My Rolex watch, a couple of pairs of gold cuff links and an antique pocket watch.
Q.        How much was your Rolex valued at?
A.        $21,000.
(Pg. 57, lines 8-25, Pg. 58, line 1)

Q.        Now, what happened to the Rolex?
A.        I sold it to a jewelry store on Park Avenue.
(Pg. 59, lines 14-15)

Q.        Okay. How much did you sell it for?
A.        I believe $7,000.
Q.        And when did you sell it?
A.        Last spring, I think.
(Pg. 59, lines 23-25, Pg. 60, line 1)

[22]Murphy realizes the watch sale is not disclosed in the statement of affairs as a sale within one year, but
Murphy disclosed this at his 341 meeting and 2004 examination, before the Plaintiff filed this suit and Plaintiff did
not allege it to be part of a false oath.

and Berman records were subpoenaed by Rivertree. R 18, Ex. 9). As Murphy testified, the contract for the house sale shows it included light fixtures (which Murphy testified included expensive antique chandeliers), the antique range. If Murphy knew the entry "other (artwork/jewelry)" was an issue, he would have subpoenaed the buyers to confirm personal property was part of the sale. Out of fairness, the Court should have allowed Murphy to reopen the evidence.

14)     The Court speculated on page 26 that Murphy "likely" owned an interest in Xethanol stock. A finding to support a denial of a discharge, should not be based upon conjecture or mere technicality, but must be real and substantial. In Re Rudolph, 2007 W.L. 559800 (11 Cir., 2007).

The speculative finding of "likely" ownership of Xethanol stock totally ignored the corroborated, unrebutted testimony of Mr. Skyranz[23], the Vice President, Secretary/Treasurer of Xethanol. He testified that Julianne Murphy Revocable Trust paid for and owned the stock (Skyranz depo, R 6, 17, pgs. 19-20); Mr. Taylor, a principal of Xethanol testified Murphy never became an owner of Xethanol stock ( R 6, 17, Taylor depo, pg. 21); Mr. Raley, the Trustee testified Mr. Murphy's trust did not own the stock (T 360)[24]. As a matter of law, the Court could not reject their uncontradicted, unimpeached testimony unless the Court showed why their testimony was inherently incredible, which it did not and could not. Benton v. Blair, 228 F.2d 55 (5th Cir., 1955). See also Republic National Bank of Miami N.A. v. Roca, 534 So.2d 736 (Fla. 3 DCA, 1988).

15)     In paragraph 34(b), Rivertree alleged the schedules were false because Murphy's 40% interest in MLP #1 Ltd. was scheduled at a value of $1.00. However, the Court's analysis of MLP on pages 17 through 19, did not review MLP for this allegation. Rather, the Court was upset that the Murphys, on behalf of MLP, made a post-Chapter 7 deal with the lender ( R 18, Ex. 21 and Ex. 22 in February 8, 2005). However, the Court's apparent anger overlooks that the MLP #1 Ltd. partnership

---

[23]Skyranz was not a friend of Murphy (Skyranz depo. Pg. 111)

[24]Mrs. Murphy also testified that she owned the stock through her trust. ( R 6, 17 Juli Murphy depo. Pgs. 124, 135-136, 210). Murphy testified he did not own stock in Xethanol. Xethanol stock book ledger shows only one owner of the stock in tracing the liquidation of the 750,000 shares in the name of Thomas A. Thomas, Trustee (Skyranz deposition, R 6, 17, R 18, last page of Exhibit 13a).

entity was not in bankruptcy, not protected by an 11 U.S.C. §362 stay, and on behalf of the entity, had to deal with the lender, whose loan was in default.

The MLP minority interest of Murphy was listed in Bankruptcy Schedule B. Rivertree presented no proof that on the day of bankruptcy, the minority interest was not worth $1.00. Also, the Trustee shortly thereafter filed his report concluding the estate was a no asset case ( R 18, Ex. 7, March 20, 2005); something still true.

16)     On page 20, the Court in looking at a matter not plead, finds that "Murphy failed to disclose his interests in various family trusts...which Murphy controlled". There was no pleading alleging this, nor proof of this.  The trusts had Mr. Patrick Raley, an attorney, as Trustee. Murphy aided the Trustee, but no evidence shows Murphy controlled the Trustee of the trusts of his family members. (T 361). Juli Murphy insisted on a third party Trustee ( R 6, 17 Juli Murphy's depo, pg. 116). The family member trusts were not alleged to be an asset of this estate in the Rivertree's Complaint nor made an issue for trial. Nor is this finding supported by the record. The trusts on their face show they were owned by members of his family when created four to five years before the bankruptcy was filed. ( R 19, Exs. 155-160).

Murphy had no legal duty to produce documents about trusts he was neither Trustee or beneficiary.  The trusts of his wife and children had an active Trustee.  The family member trust documents do not show Murphy was a beneficiary or Trustee of the trusts when the bankruptcy was filed.

Indeed, Murphy did only schedule one of the trusts he created in the late 90's. The one he scheduled was stated as valueless. The term insurance policy had been canceled and the trust had no other holdings. Once again, Plaintiff came forward with no document to refute Murphy's testimony. Looking at the financial statements which the Court utilized extensively in its opinion, the only financial statement where the trust is shown is on Exhibit 170 January 31, 2003 (which is a handwritten date over the typed April 2002 date). The later dated admitted financials do not show a trust. (Plaintiffs Ex. 171, 172).

24

**ARGUMENT #5 - The Court committed reversible legal error by admitting, over objection, unreliable financial statements, not given to Plaintiff and which financial statements could only be reasonably read to be plead toward Plaintiff's dismissed 11 U.S.C. §523 count, or alternatively, using them for purposes other than for §727(a)(5).**

It was error to admit Rivertree's Exhibits 170-172 financial statements for all the uses made by the Court in the opinion. They clearly prejudiced the Court as they are discussed throughout the opinion. Rivertree's evidence did not show the assets in the financial statement still existed and had value on bankruptcy day. The Court held Murphy to the unreliable financial statements, thinking they were sworn to, when they were not.

It was error for the Court to heavily rely upon them, after the Court found them to be unreliable, on the following pages of the opinion:

1) They are part fact and part fiction (the Court does not identify which are fact and which are fiction) (pg. Nine)

2) "Vary dramatically, each lists different assets" (pg. Eight);

3) Contain "numerous and significant disparities between financial statements" (pg. Five);

4) The truthfulness of the financial statements "supplied is dubious" (pgs. Nine and ten).

5) "A part of each financial statement likely is accurate but given the substantial differences between them, it is impossible to tell fact from fiction" (pg. Nine).

In contradiction to the Court's heavy reliance on the erroneous financial statements, the Court at page 37 of the Opinion, acknowledged Rivertree failed to prove Murphy owned assets on the date of bankruptcy, that were not disclosed (again remembering Rivertree did not plead the assets the Court listed in its finding). There, the Court stated:

"Perhaps he still has the assets he claimed on the financial statements. Perhaps, he never had the assets. It is simply impossible to ascertain exactly what Murphy owned and its value on the petition date".

In addition, the unsworn, unaudited, confidential financial statements, given to others, should not have been admitted into evidence because they were plead toward the dismissed §523. Rivertree used

them to show why the negative financial statement Murphy gave Rivertree was allegedly false. They were never intended by Rivertree's Complaint to be used as the Court used them to deny Murphy his discharge under §727(a)(3) or (5).

The only allegations in Rivertree's Amended Complaint concerning the financial statements appear at paragraphs 13-15, 22-29, 35 and 38. Paragraph 38 merely says Murphy objected to subpoenas issued to third parties. Paragraphs 13 -15 and 22 - 29 can only be read to apply to the dismissed §523 count. Paragraph 35 could only apply toward the §727(a)(2) case, where the Court found Rivertree failed to prove Murphy made any transfers or concealed assets within a year of the bankruptcy filing. (Opinion pg. 32, footnote 31).

While Murphy should have better read the financial statements before their release, the mistakes came largely due to his secretary who was not skilled in the Excel computer program ( R 6, 17 Judy Piersoll depo, pg. 43).

The financial statements were given to third parties, and not Rivertree.  No banker they were provided to ever testified.  There was no showing that any creditor relied upon any of the financial statements (only applicable to a §523 case).  Each were given in confidence and state they are not audited. They were all unverified and unsworn. They were mistake-filled as shown during trial. If they contained false information, the Court could not use the false information given pre-bankruptcy, in the bankruptcy trial because the false oath must be within a bankruptcy proceeding under §727.

Erroneously, the Court concedes the financial statements have wrong information, but yet unfairly uses them to require Murphy to account for something the Court already found to be false.

In overruling the objection to the admission of the financial statements (T 32), the Court stated they were admitted to prove concealment (§727(a)(2)), or for unexplained disappearance of assets (§727(a)(5)). However, the opinion used them for much more than this. Even if they were admitted for §727(a)(5) reasons, they should not have been used for credibility reasons, to criticize their trust worthiness, or to find they were given to deceive. Even after the admission in evidence of the financial

26

statements, their importance should have disappeared once the Court realized they were not reliable, and when Murphy's documents and testimony satisfactorily explained what became of assets (or showed why assets in the financial statement were mistakenly listed as his assets).

## CONCLUSION

The Court committed multiple legal errors which resulted in prejudicial unfairness to justify a reversal.

Without being asked, the Court went outside the pleadings and made findings not supported by the record, and irrelevant to a §727 action, to deny Murphy's discharge under §727(a)(3), (a)(4), and (a)(5). It began in the first paragraph of page one of the opinion when the Court stated that Murphy has a long history of lieing to his creditors and manipulating his financial condition up or down if it would work to his advantage. Not only did a creditor not testify to this, such finding is not applicable to §727 actions. Only in a §523 action does the Court consider fraud or lies to a creditor.

The Court's travel into unplead territory and review of excluded evidence affected the Court's thinking to the prejudice of Murphy, because it caused the Court to totally ignore his testimony.

It was also not fair for a Court to base its decision on unplead issues and then refuse a request to supplement the opinion's questions asking why Murphy did not address it.

Nor was it fair to require Murphy to go to trial on §727(a)(2) and (4) which are fraud claims and not require they be plead with specificity. Here, Murphy went to trial on a pleading that realleged 39 paragraphs, including 41 additional sub and sub subparagraphs, reincorporated into six different counts.

Nor was it fair for the Court to allow into evidence totally unreliable, unsworn financial statements given to third parties confidentially, without audits, and upon realizing they were not reliable, heavily rely upon them, accusing Murphy of lieing because the Court mistakenly thought they were sworn to when they were not.

Nor was it fair for the Court to consider Rivertree's Exhibit 15 for identification, when it was not in evidence and after being influenced by it and used in the opinion, dismiss the error as harmless.

27

Rivertree's Exhibit 15 contained prejudicial hearsay, an unauthorized summary, ill founded conclusions, and wrong speculations.

Nor was it fair for the Court to open up discovery against Murphy and third parties for 18 months after bankruptcy, and improperly use it in the opinion, when the Bankruptcy Code only considers property of the estate to include a few assets, acquired within six months after bankruptcy. 11 U.S.C. 541(a)(5).

Nor was it fair for the decision to inaccurately make findings not supported by the record, and to include in its opinion pure speculation using words such as "likely", "perhaps", "probably" (Opinion pgs. 13, 26, 37) on topics not proven by Rivertree. For example, Murphy "likely" owned an interest in Xethanol stock (Pg. 26); or notwithstanding Rivertree, after eight depositions and 50 subpoenaed entities, could not show a sizable asset for the Trustee to administer, to state: "the Court is convinced that Murphy retained assets, but chooses not to share that information with others". (Opinion, pg. 31).

It is obvious Rivertree's proofs under §727(a)(3),(5) failed when the Court stated on page 37 of the opinion, "perhaps he still has the assets he claimed on his financial statements.  Perhaps he never had the assets. It is simply impossible to ascertain exactly what Murphy owned and its value on the petition date".

This statement shows Rivertree did not prove or refute Murphy had no assets. If Rivertree had shown the Court an asset was available for a Trustee to liquidate, the Court would have had record support to deny a discharge.

Murphy's testimony and documents showed his loss of assets (a)(3) and explained why assets in the financial statement no longer had value or existed. There was no "perhaps". The evidence could only be viewed to prove the assets in the financial statements were either mistakenly included or no longer had value because they  went bankrupt, or out of business. Not having proof to the contrary, while the Court was not happy about following the evidence presented, the Court should have accepted that Rivertree failed to carry its burden of proof and Murphy did meet his requirements under §727(a)(3),(5).

28

Lastly, the two items stated to be false oaths, were not plead with specificity, were not material and the opinion does not find Murphy had the intent to commit false oaths as required by §727(a)(4). Nor did this record show Murphy intended to commit false oaths. The bank account was disclosed. John Murphy is the Debtor's legal name. Whether he uses senior or junior, his social security number remains the same.

WHEREFORE, Murphy prays the Court reverse the opinion of the Bankruptcy Court, finding Rivertree failed to prove that which it plead under §727(a)(3),(4) and (5) and directing the Court to find Murphy is entitled to a discharge. Alternatively, to reverse the opinion and allow a new trial excluding the objected to evidence and findings on matters not plead in the Rivertree's Amended Complaint.

RESPECTFULLY SUBMITTED this 22nd day of February, 2008.

Raymond J. Rotella
Kosto & Rotella, P.A.
Post Office Box 113
Orlando, Florida 32802
Telephone 407/425-3456
Facsimile 407/423-5498
Fla. Bar No. 157951
Rrotella@kostoandrotella.com
Attorneys for Appellant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was furnished by United States Mail and/or electronic transmission to I. William Spivey, II, Esquire, 450 S. Orange Avenue, Suite 650, Orlando, Florida 32801 this 22nd day of February, 2008.

Raymond J. Rotella
Kosto & Rotella, P.A.
Post Office Box 113
Orlando, Florida 32802
Telephone 407/425-3456
Facsimile 407/423-5498
Fla. Bar No. 157951
Rrotella@kostoandrotella.com
Attorneys for Appellant