**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**IN RE: JOHN J. MURPHY, SR.**
**BANKRUPTCY CASE NO. 6:04-Bk-1612-KSJ**
**Adv. Case No. 6:04-Ap-154-KSJ**

**JOHN J. MURPHY, SR.,**

      **Appellant**

-vs-                                                  **Case No. 6:08-cv-198-Orl-31**

**RIVERTREE LANDING LLC,**

      **Appellee.**

# ORDER

This cause came before the Court on the appeal filed by John J. Murphy ("Murphy") of the decision[1] of the Bankruptcy Court to deny his discharge pursuant to an adversary complaint filed by the Appellee, Rivertree Landing LLC ("Rivertree").

**I.     Background**

By all accounts, Murphy is an educated and sophisticated businessman. He has a finance degree from Rollins College and at least two decades' worth of experience in commercial and residential real estate development and financing. He has owned and/or directed more than 20

---

[1] Murphy appealed six decisions of the Bankruptcy Court: Its Findings of Fact and Conclusions of Law, dated October 16, 2007; its Final Judgment dated October 16, 2007; its Memorandum Opinion dated December 13, 2007 partially granting Murphy's Motion for Reconsideration; its Order of the same date partially granting that motion; its Amended Findings of Fact and Conclusion of Law, also dated December 13, 2007; and its Amended Final Judgment of the same date. (Doc. 1-2).

business organizations that operated in the real estate development field, at least four of which filed for bankruptcy before the institution of these proceedings.

Murphy's dispute with Rivertree dates back to 1998, when Inland Mortgage Corporation ("IMC") lent money to one of Murphy's business entities. Murphy personally guaranteed the loan. He provided a financial statement to IMC showing that he had a personal net worth slightly in excess of $15 million. The entity subsequently defaulted on the loan, IMC foreclosed, and Murphy became personally responsible for a substantial deficiency. That liability was assigned to Rivertree.

In June 2002, Murphy provided a personal financial statement to Rivertree showing his net worth had deteriorated to a *negative* $24.5 million. Rivertree then settled its claim against Murphy on the guaranty for approximately $900,000, to be paid over time. After making a few payments, Murphy defaulted, and Rivertree obtained a $879,987.91 final judgment against him.

Murphy filed a Chapter 7 bankruptcy petition on February 17, 2004. He listed assets of less than $1,000 and liabilities exceeding $5 million. On July 2, 2004 Rivertree filed an adversary complaint objecting to Murphy's discharge under several provisions of the Bankruptcy Code. On June 30, 2005, after the Bankruptcy Court dismissed the first complaint, Rivertree filed an amended adversary complaint (the "Amended Complaint"), objecting to Murphy's discharge under 11 U.S.C. § 727(a)(2), (3), (4) and (5), as well as 11 U.S.C. § 523(a)(2). (Doc. 2-11).

Prior to trial, Rivertree voluntarily dismissed its count seeking relief pursuant to 11 U.S.C. § 523(a)(2). After a three-day hearing, the Bankruptcy Court denied the relief sought by Rivertree pursuant to 11 U.S.C. § 727(a)(2) (fraudulent transfer or concealment) and 11 U.S.C. § 727(a)(4)(D) (withholding records from officer of estate). The Bankruptcy Court denied Murphy's

discharge under 11 U.S.C. § 727(a)(3) (failure to keep proper records), 11 U.S.C. § 727(a)(4)(a) (false oath), and 11 U.S.C. § 727(a)(5) (failure to explain loss of assets). (Doc. 1-7 at 38). Murphy sought reconsideration of that decision on numerous grounds. The Bankruptcy Court found that one of Murphy's arguments – that it had erroneously relied on an exhibit[2] that had not been admitted into evidence – was factually correct, but that the error was harmless. The Bankruptcy Court rejected the remainder of Murphy's arguments and entered amended findings of fact and conclusions of law to delete references to the unadmitted exhibit. This appeal followed.

## II.     Standards

### Standard of Review

Upon entry of a final order by the bankruptcy court, a party may appeal to the district court pursuant to 28 U.S.C. § 158(a). The district court functions as an appellate court in reviewing decisions of the bankruptcy court, reviewing its legal conclusions *de novo* and employing the clearly erroneous standard in reviewing its findings of fact. *In re Colortex Industries*, 19 F.3d 1371, 1374 (11th Cir. 1994). A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *U.S. v. U.S. Gypsum Corp.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). In reviewing findings of fact, due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses. *In re Thomas*, 883 F.2d 991, 994 (11th Cir. 1989) (citing *Fed.R.Bankr.Pro.* 8013). Orders implicating the equitable discretion of the bankruptcy court are reviewed for an abuse of discretion. *Colortex* at 1374.

---

[2] The exhibit at issue, which had been prepared by counsel for the Plaintiff, was a summary of documents produced by Murphy. Murphy successfully objected to its admission at trial. (Doc. 1-5).

**Discharge**

The debtor's fresh start is the primary objective of bankruptcy law. *In re Chauncey*, 454 F.3d 1292, 1295 (11th Cir. 2006). As such, "all debts that arose before the date of the order for relief" are generally discharged in Chapter 7 proceedings. 11 U.S.C. § 727(b). Courts construe the statutory exceptions to discharge liberally in favor of the debtor and recognize that the reasons for denying a discharge must be real and substantial, not merely technical and conjectural. *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994). Section 727(a) of the Bankruptcy Code provides, in pertinent part, that the court shall grant the debtor a discharge of his debts, unless –

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case--
> (A) made a false oath or account;
>
> ...
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

The party objecting to the debtor's discharge has the burden of establishing that the debtor is not entitled to receive a discharge by a preponderance of the evidence. *In re Chalik*, 748 F.2d 616 (11th Cir. 1984).

### III.  Analysis

Murphy raises five objections to the order denying his discharge. Each is addressed in turn below.

### A. False oath

In determining that Murphy had made a false oath, the Bankruptcy Court found, *inter alia*, that he had signed his bankruptcy petition using the suffix "Sr" rather than employing the "Jr" that he had used before and after the filing, "likely hoping to distance himself from the bankruptcy after the case is closed and to confuse his creditors while the case is pending." (Doc. 1-7 at 35-36). The Bankruptcy Court also found that Murphy had understated the amount of money in a joint account he held with his wife (the "Joint Account"), listing it on his schedule as containing $500 when it actually contained about $1,900 on the filing date. (Doc. 1-7 at 36).

Murphy argues that these things were neither fraudulent nor material. He contends that he began using "Sr." as a tribute after his father died, rather than in an attempt to mislead his creditors, and the fact that his wife also made deposits into the joint account made it easy to make a mistake as to its balance. As for materiality, Murphy argues that no creditor testified that it had been misled by his use of the "Sr" suffix, and the true amount in the joint account was trivial when compared to the size of his $5 million-plus in liabilities.

For a false oath to preclude discharge, it must be both fraudulent and material. 11 U.S.C. § 727(a)(4). A false oath or claim is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of his property." *Chalik*, 748 F.2d at 618. A knowing and fraudulent omission from a sworn Statement of Affairs or schedule my constitute a false oath. *Id.* at 618 n.3.

The Bankruptcy Court was not obligated to find that Murphy's use of "Sr" to sign his petition was other than fraudulent or done without the intent to deceive his creditors. Murphy's inability to produce any other documents signed in this fashion, combined with numerous

documents signed as a "Jr" – including one post-petition – support the Bankruptcy Court's finding that Murphy employed the suffix in hopes of misleading creditors. Along the same lines, the simple fact that another person sometimes made deposits into the Joint Account does not establish, on its own, that this was the reason that Murphy misstated its balance when he filed his bankruptcy petition. The Bankruptcy Court was not compelled to find that the misstatement was an innocent error. The lack of evidence that any creditor was misled by the use of the "Sr" suffix is not relevant, as is the fact that the joint account held a relatively small amount of money. Detriment to a creditor need not be shown in order to bar discharge for making a false oath. *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984).

> The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. It makes no difference that he does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them. The veracity of the bankrupt's statements is essential to the successful administration of the Bankruptcy Act.

*Id.* (internal citations omitted).

The Court also notes that the Bankruptcy Court's grounds for finding that Murphy made a false oath extended well beyond the two items Murphy addresses. Beyond the inexplicable use of "Sr" on his petition, the Bankruptcy Court found that Murphy failed to list the other names he had used during the six years preceding his filing – not "J. Murphy," "John J. Murphy," or "John J. Murphy Jr." – all of which he had employed during that time. (Doc. 1-7 at 36). The Bankruptcy Court also found that Murphy failed to disclose a Century Bank account that contained $109,000 as of May 2003 (according to an earlier financial statement of Murphy's) and only disclosed the existence of one of three personal trusts. (Doc. 1-7 at 36). Even if Murphy were correct regarding

his use of "Sr" on his petition and the amount in the Joint Account, these additional failures would support denial of discharge pursuant to Section 727(a)(4). The Bankruptcy Court's findings on this point were not clearly erroneous.

### B. Explanation for loss of assets

The Bankruptcy Court's finding that Murphy had failed to adequately explain the loss of his assets rests in large part on financial statements Murphy provided to third parties – one in January 2003, one in April 2003, and one in May 2003. (Doc. 1-7 at 6). Each of these financial statements, which were reviewed and signed by Murphy, purport to show that he had a substantial *positive* net worth: approximately $8 million in January 2003; $5.8 million in April 2003; and $5.7 million as of May 29, 2003. (Doc. 1-7 at 6-8).

Murphy first argues, in essence, that he was sandbagged at trial, because many of the lost assets the Bankruptcy Court found he failed to explain were "not plead by Plaintiff." (Doc. 22 at 15). This argument does not hold water. Rivertree's Amended Complaint (Doc. 2-11), filed on June 30th, 2005, includes in its section titled "Allegations Common to All Accounts" detailed references to (and attachments of) all of Murphy's financial statements that listed these assets. For example, the following is taken from page 7 of the Amended Complaint:

> 25.    In April, 2002, and as updated by handwritten notations on January 31, 2003, Murphy provided a financial statement to First Chatham Bank in which Murphy (each time) represented his net worth to be positive $7,966,810.00 (collectively, the "January 2003 Financial Statement"). A copy of the January 2003 Financial Statement is attached as Exhibit "E". That is, one month after the effective date on which Murphy was supposedly worth negative $24,000,000, ... Murphy was creating (and circulating) financial statements indicating he was a multi-millionaire.

(Doc. 2-11 at 7). The Amended Complaint contains similarly detailed references to the other financial statements at issue in the adversary proceeding, each of which was also attached. (Doc. 2-11 at 6-8). The allegations regarding the 2003 financial statements were plainly plead as being relevant to *all* of the counts in the Amended Complaint. Despite Murphy's (unsupported) assertions to the contrary, there is no reasonable reading of the Amended Complaint that suggests those financial statements were relevant only to counts on which Murphy prevailed.

Similarly, despite Murphy's assertions, there is no reasonable way to read the Amended Complaint that suggests that only one or two of the assets listed on those earlier financial statements were at issue in the adversary proceeding. It is true that the Amended Complaint did not list all of the assets from those financial statements whose values had substantially and inexplicably diminished before the filing of the bankruptcy petition. However, those assets that *were* listed in the Amended Complaint were clearly denominated as examples of the problem, not the entirety of it:

> 34.     The Debtor's Schedules contain representations in respect of the values of particular assets that are either false or, with respect to such asset, the Debtor has failed to explain their present lack of value in light of a prior representation of significant value. *Examples of such representations are*:
>
> a.      Schedule B § 12 – The Debtor represented that his interest in "Freeport Partners" had a market value at the time of filing of $1.00, yet in the April 2003 Financial Statement the Debtor represented that his interest in "Freeport, Inc." was $750,000.00

(Doc. 2-11 at 10) (emphasis added). The profound difference between the picture painted by Murphy in his financial statements in 2003 and the one he presented to the Bankruptcy Court in 2004 was a central theme of the Amended Complaint. Murphy cannot reasonably claim surprise

that he was called on to address a number of assets listed in those previous financial statements aside from those described as "examples".

Murphy's attempt to explain the dramatic drop in asset values is far from compelling, to put it mildly. He contends that many significant assets shown on his 2003 financial statements were simply included by mistake, such as a $449,000 receivable from an entity called "Very Smart Networks," a $656,000 net interest in "CC Residential," a $54,000 IRA/profit sharing plan that had allegedly been cashed out in 2000, and a ten percent ownership interest in "Xethanol," valued at $855,000, among others. (Doc. 22 at 16-17). Other assets he claims to have simply sold, with no real records of the transaction, such as $274,000 in jewelry and art that was allegedly sold with his home. (Doc. 22 at 17).

To prevail on its objection under Section 727(a)(5), the creditor has the initial burden of showing that the debtor formerly owned substantial, identifiable assets that are now unavailable to distribute to creditors. *In re Tran*, 297 B.R. 817, 836 (Bankr.N.D.Fla. 2003). If the creditor makes this showing, the burden shifts to the debtor to establish a satisfactory explanation for the reduction in assets. *Id.* A satisfactory explanation is one that convinces the judge; vague and indefinite explanations of losses will not suffice. *Chalik*, 748 F.2d at 619.

In his brief, Murphy attempts to argue that despite the "ambush," he was nonetheless able to prove that at least some of the assets alleged to be worth hundreds of thousands or millions of dollars in his 2003 financial statements were worthless in February 2004, when he filed his bankruptcy petition. (Doc. 22 at 15-17). However, for the most part, his evidence of this is simply his testimony to that effect. For example, he argues that two of the entities provided as examples in the First Amended Complaint – Freeport and MLP #1 – "were proven to have no real worth."

(Doc. 22 at 15).  In support of this, Murphy points only to the trial transcript where, under questioning from his attorney, he testified that he believed he had correctly valued those assets as worthless when he filed his bankruptcy petition. The testimony to which he refers contains no explanation or references to documents from which a creditor might verify his explanation for the reduction in value.  The same holds true for, *inter alia*, Murphy's explanation as to the $356,000 due from Freeport, $1,000,000 in developer fees due from multiple entities, and $457,000 in Medina, all listed in his 2003 financial statements and all allegedly uncollectible in 2004.  And it gets worse: For some assets listed on one or more of his 2003 financial statements – such as $109,000 in various bank accounts and a term life insurance policy worth valued at $3.6 million – Murphy simply alleges in his brief that they disappeared, without even citing to trial testimony to that effect.  (Doc. 22 at 16-17)).

    It was not clearly erroneous for the Bankruptcy Court to fail to believe that a sophisticated businessman with a finance degree and decades of experience made so many mistakes in his signed financial statements, regularly including hundreds of thousands of dollars' worth of assets that did not, in fact, belong to him.  In other words, it was not clearly erroneous for the Bankruptcy Court to credit Murphy's 2003 financial statements rather than his subsequent testimony.  Nor was it clearly erroneous to conclude that Murphy's testimony, alone, was insufficient to explain the disappearance of millions of dollars in assets that he *did* admit having possessed in 2003.

**C. Failure to produce sufficient records**

The purpose of Section 723(a)(3) is to make certain that creditors and the trustee are given sufficient information to understand the debtor's financial condition. *In re Khanani*, 374 B.R. 878, 886 (Bankr.M.D.Fla. 2005). The section does not require a full accounting of every business transaction, but there should be some written records, orderly made and preserved, from which the present and past financial condition of the debtor may be ascertained with substantial completeness and accuracy. *Id.* (citing *In re Sowell,* 92 B.R. 944, 947 (Bankr.M.D.Fla. 1988)). The standard applied to a debtor who is involved in business may be more stringent than the standard imposed on a debtor who is an unsophisticated wage earner. *Id.*

The Bankruptcy Court found numerous instances where Murphy failed to adequately account for his financial condition. For example, in the eight months before Murphy filed for bankruptcy protection, deposits into the Joint Account[3] averaged more than $25,000 per month. In his bankruptcy schedules, however, Murphy reflected that he received only $6,000 per month in income. The Bankruptcy Court noted that Murphy testified that he deposited $10,000 into the account in June 2003 from the sale of his home, that his wife deposited $13,000 into the account in December 2003 from the sale of her own business, and that the landlords of his wife's rental home deposited $30,609.03 into the account for her to pay real estate taxes. (Doc. 1-7 at 14). Even accepting Murphy's mostly uncorroborated testimony on these points, the remaining unexplained deposits still averaged nearly $18,000 per month.

---

[3]Murphy added his wife's name to the account less than a week before the petition date.

Murphy attempted to explain some of the deposits by testifying that a friend, Chris Taylor, loaned him money in the year preceding the bankruptcy filing.  Taylor owned a company called London Manhattan, which transferred at least $19,500 to the account during that period.  However, Taylor testified that Murphy had previously loaned $40,000 to London Manhattan, and that the $19,500 constituted loan *repayments* to Murphy, rather than a loan to him.  Neither Murphy nor Taylor produced any documents, such as promissory notes, relevant to this transaction.  The Bankruptcy Court did not clearly err in refusing to credit Murphy's explanation on this point.

In addition, Murphy had a second, individual bank account (the "Individual Account") that the Bankruptcy Court found that he failed to properly account for.  (Doc. 1-7 at 15-16).  The Bankruptcy Court noted $7,475 in transfers from the Individual Account into the Joint Account shortly after the petition date and found that Murphy failed to explain those transfers.  (Doc. 1-7 at 15-16).  Murphy complains that the Individual Account was not opened until after he filed for bankruptcy, and therefore it was improper for the Bankruptcy Court to penalize him for failing to list the account on his bankruptcy schedules.  However, the Bankruptcy Court found that Murphy failed to provide any documents from which creditors could establish the date on which that account was opened, producing only a single bank statement – for the period from March 23, 2004 to April 21, 2004.  (Doc. 1-7 at 16).  In his brief, Murphy does not point to any documents from which the opening date of the Individual Account could be established, or any documents explaining the origin of the money transferred from it.  The Bankruptcy Court's findings on this point were therefore not clearly erroneous.

The Bankruptcy Court also found that Murphy failed to properly account for the loss of $274,000 in art and jewelry that had been listed on all three 2003 financial statements but not on

his 2004 bankruptcy schedules. (Doc. 1-7 at 16). According to the Court, Murphy never identified the jewelry or explained what happened to it. (Doc. 1-7 at 16). In addition, Murphy contended that the bulk of the art had been sold along with his Winter Park home in 2003, but none of the documents he produced, such as the closing statement from the sale, supported this. (Doc. 1-7 at 16).

And the list goes on. That closing statement shows that Murphy and his wife received approximately $48,000 in cash from the sale of the Winter Park home, but Murphy only accounted for $10,000 of that sum that was deposited into the Joint Account. Murphy failed to disclose the existence of a bank account with Century Bank that, although closed before he filed for bankruptcy, contained $109,000 in May 2003 (according to his May 2003 financial statement). Murphy created eight separate trusts for family members – three for himself, one for his wife, and one for each of his four children. Although he denied it, there was evidence to support the Bankruptcy Court's finding that he controlled all eight, directing the trustee to transfer assets into and out of the trusts.[4] He failed to disclose the existence of seven of the trusts, including two of the three in his name. He did not provide documentation, such as a schedule of assets, for the two personal trusts he failed to disclose, instead simply testifying that those trusts held no assets. He also failed to provide documentation for the other five trusts he claimed not to control. He claimed that the children's trusts never held any assets, but also testified that those trusts were partial owners of an entity called Technology Real Estate Partners of Winter Park, LLC.

---

[4]The attorney who served as trustee for the eight trusts beginning in June 2003 testified he was never given complete control of the trusts, never saw a schedule listing the assets held by any of the trusts, and could not credibly testify as to the assets held by any of the trusts as of the petition date.

The Bankruptcy Court's meticulously documented 38-page order contains several other significant assets in regard to which it found Murphy failed to produce adequate documentation, but in the interest of brevity this Court will not list them all.  Suffice it to say that, after reviewing the record in this case, the Bankruptcy's findings on this score were well supported by the evidence.

For his part, Murphy contends that he did comply with Section 727(a)(3), pointing to seven boxes of records he produced.  (Doc. 22 at 19-20).  The Bankruptcy Court found that these documents were "largely irrelevant filler."  (Doc. 1-7 at 29).  According to the Bankruptcy Court, most of the records related to the finances of Murphy's companies, rather than Murphy himself, and that they were only marginally relevant on that score, as Murphy "did not produce general ledgers, cash flow statements, balance sheets, or the normal type of financial reports that would allow creditors to ascertain a company's value."[5]  (Doc. 1-7 at 29).  As evidence of their irrelevance, the Bankruptcy Court noted that "Murphy himself did not rely on these documents at trial to support his position that a discharge should issue."  (Doc. 1-7 at 29).  Murphy argues that both of these statements are incorrect, but fails to point to a single relevant document within those seven boxes or explain where such a document (or the summary of the documents within those boxes) was actually utilized at trial.  (Doc. 22 at 19-21).

---

[5]Murphy misapprehends the Bankruptcy Court's point in making this statement, arguing that these are the sorts of records a legal entity keeps, not an individual, and that he should not be faulted for failing to keep (or produce) such records as to his personal finances.  (Doc. 22 at 21).  But the Bankruptcy Court was not contending that Murphy should have produced those records in regard to his own finances.  Rather, the point was that the records he *did* produce were not very helpful in deciphering the financial condition *of his companies*.

Aside from general statements that his life became more complicated and that he moved several times shortly before filing for bankruptcy, Murphy offers no explanation as to the specific records he was faulted for failing to produce (such as statements for the Individual Account, and asset schedules for the trusts). (Doc. 22 at 19). Murphy does attempt to explain his failure to produce copies of his 2003 financial statements, which Rivertree was forced to gather via discovery from third parties. In his brief, Murphy argues that he and his former secretary testified that the financial statements "became lost" when "Very Smart Networks" – an entity Murphy worked for – "went out of business after Murphy left their employ and their sole officer and majority shareholder became deceased." (Doc. 22 at 18 n. 6). However, Murphy does not even cite to his own testimony in support of this somewhat implausible-sounding story. Rather, he points to the testimony of his secretary, who merely testified that she had no idea where any of the financial statements might be, but that the person who most likely had knowledge was Jack Duvall, an employee of Very Smart Networks who was "put in charge of moving the files as we would go from office to office" but who had died sometime in 2005. (Doc. 17, Piersol deposition at 74-75.) Murphy fails to explain (or point to evidence explaining) why he had no other copies of his personal financial statements, why those records remained at Very Smart Networks after he left, what efforts he had made to retrieve those records before or after Duvall's death in 2005, and so on. Again, the Bankruptcy Court did not clearly err in declining to accept this explanation for Murphy's failure to produce these records. Nor did it clearly err, given the preceding, in concluding that a sophisticated, experienced businessman such as Murphy had failed to produce sufficient records to allow his creditors to properly understand his financial condition.

### D. Cumulative error and improper admission of evidence

Murphy's fourth and fifth arguments do not merit extended discussion. In essence, his fourth argument consists of Murphy restating every point he made in connection with his previous three arguments and contending that the Bankruptcy Court's errors, even if harmless individually, were sufficient in the aggregate to deny him his right to a fair trial. (Doc. 22 at 22). Even if the so-called cumulative error doctrine applies in civil proceedings – something Murphy has not demonstrated – the vast majority of the alleged errors Murphy points to were not errors, as described above.

Murphy's final argument is that the Bankruptcy Court erred in admitting into evidence, over his objection, the three 2003 financial statements, and in relying upon them after finding them unreliable. Murphy offers only conclusory statements that, somehow, the documents were included in the Amended Complaint only for their relevance to the Section 523 claim or the Section 727(a)(5) claim, and that it was error for them to be used in connection with any other claim. (Doc. 22 at 31). As noted above, the Amended Complaint contained extensive references to the 2003 financial statements, and there was no indication that they were only relevant to one

particular count.  The Bankruptcy Court did not clearly err in relying, at least in part, on Murphy's own records of his financial condtion.

## IV.     Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the decision of the Bankruptcy Court is **AFFIRMED.**  The Clerk is directed to close the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 27, 2008.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party